590 So.2d 1374 (1991)
Oscar WILLIAMS
v.
STATE of Mississippi.
No. 90-KA-0194.
Supreme Court of Mississippi.
November 13, 1991.
Albert S. Johnston, III and Henry P. Pate, III, Pascagoula, for appellant.
Mike C. Moore, Atty. Gen. and John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:
This is an appeal from the Greene County Circuit Court wherein the defendant, Oscar Charles Williams, was convicted of armed robbery by a jury of his peers and sentenced to a term of five years to the Mississippi Department of Corrections. Oscar Williams now appeals his conviction to this Court with two assignments of error. Both assignments merit discussion for our consideration of the case.
After thoughtful deliberation and a detailed examination of the record in this case, we must affirm Williams' conviction of armed robbery and sentence of five years to the Mississippi Department of Corrections. The two issues which we consider today are:
I. DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S MOTION TO PROVIDE A SPECIAL VENIRE?
II. WAS THE DEFENDANT ENTITLED TO A JURY INSTRUCTION CLAIMING SELF-DEFENSE UNDER THE UNIQUE CIRCUMSTANCES OF THIS CASE?

FACTS
Oscar Charles Williams had never had any trouble with the law until September 4, *1375 1988; however, on this fateful day, everything changed.
Patrolman Tommy Henderson of the Mississippi Highway Patrol was patrolling with McLain Police Chief Bobby Sam Brannon in rural Greene County on Highway 98 when they met Williams driving a Chevy Blazer. Patrolman Henderson said he clocked the Blazer at sixty-nine (69) miles an hour in a fifty-five (55) m.p.h. speed zone. As the officers pursued the Blazer, they noticed two things. First of all, the vehicle was weaving a bit. Second, there appeared to be some sort of commotion going on in the vehicle with the driver and its two passengers. Once the Blazer stopped, Patrolman Henderson told Police Chief Brannon to wait in the patrol car while he approached the vehicle. When Henderson asked the defendant, Oscar Charles Williams, for his license, he smelled alcohol from the inside of the Blazer. The erratic driving pattern and the smell of alcohol made Henderson suspect that Williams had been drinking. Henderson asked Williams if he knew that he had been weaving. Williams responded that he was unaware that he was weaving but that he could have been because he was trying to eat a piece of chicken and drive at the same time. Henderson instructed Williams to exit the vehicle. When Williams opened the door of the Blazer, an empty beer can fell out onto the pavement. By this time, Officer Brannon had walked up from the patrol car. Officer Brannon and Williams recognized each other since both had grown up in the same community.
Patrolman Henderson asked Officer Brannon to take Williams back to the patrol car to administer an intoxilizer test.[1] Officer Brannon and Williams walked back to the patrol car which was parked behind the Blazer. Williams testified that Officer Brannon told him that he did not have to take the test, to which Williams replied that he did not want to take the test. At trial, Brannon could not remember how he presented the test to Williams. He could not remember if he instructed Williams to take the test and Williams refused or whether he "offered" the test and Williams declined it. In any event, Williams refused to take the test.
While Brannon and Williams were at the patrol car, Patrolman Henderson conducted a search of the Blazer. Henderson recovered Williams' fishing pistol from the console between the front seat and scraped out the bullets with a knife since the bullets had corroded in the gun. Officer Brannon told Patrolman Henderson that Williams refused to take the test. Then, Patrolman Henderson stated that he took the intoximeter from Brannon's hands and stuck it up to Williams' mouth in an effort to get him to blow into it. Williams jerked back away from the intoximeter and would not cooperate. Henderson told Williams that if he took the test and passed it, he would be free to go. On the other hand, if he refused the test he would have to haul him in to Leakesville to take the test there. Henderson explained that if he then refused the test in Leakesville, he would be charged with D.U.I. According to Patrolman Henderson and Williams himself, Williams replied, "Take me to Leakesville."
Patrolman Henderson instructed Williams to accompany him to the back of the patrol car. Henderson had taken the keys from the Blazer, and he also had the fishing pistol. Henderson gave both items to Brannon, and Brannon placed the keys and gun in the seat of the patrol car. At this point, Officers Henderson and Brannon along with the defendant, Williams, were at the back of the patrol car. Patrolman Henderson told Williams to put his hands on the car. Williams initially put his hands on the back of the car while Henderson conducted a pat down search. Then, Patrolman Henderson told Williams to put his left hand behind his back so that he could be handcuffed. Williams responded by *1376 turning partially around and informing Henderson that he was not going to be handcuffed. "You're not puttin those ... handcuffs on me." Henderson stated that he explained to Williams that it was department policy to handcuff all persons who are arrested. According to Brannon who was standing four to five feet away at this time, he told Williams to do as the man (Henderson) said and not to cause any trouble. The two argued about it for awhile with Henderson telling Williams that he was under arrest and had to be handcuffed with Williams refusing the handcuffs.
The testimony indicated that Williams and Patrolman Henderson were standing toe to toe facing each other at the back of the patrol car arguing about the handcuffs. According to both officers, Williams shoved Patrolman Henderson first, and then Williams took a swing at Henderson. Patrolman Henderson avoided the punch, and responded to this aggression by hitting Williams with a flashlight, presumably on the top of the head. Another lick followed to the mouth.
Williams gave a different version of events at this point. Williams testified that when he turned around after the pat down, the patrolman hit him in the mouth with the flashlight. "[W]hen I looked back around at him like that, that's when he popped me with that flashlight... ."
Patrolman Henderson's testimony is illustrative of what transpired next.
A. I hit him with the flashlight. And then he come on in towards me and I swung again. And at that time we went together; he grabbed me and I grabbed him  he grabbed me and I grabbed him and we just kind of tussled down by my patrol car, the side of my patrol car. He would swing me into the side and then I would swing him back around and he kind of swung me back around. When we made it to the hood, he swung me across the hood. I was laying across the hood and he was up on my back. And I heard the police officer holler, "He's getting your gun." And at that time I looked down and I saw my gun breaking the holster. Well, when it was coming out, I broke loose and I ran in front of my patrol car, ran over behind the Gulf station. That's where I had him stopped at is the Gulf station. I ran over toward behind the Gulf station. When I got over to the Gulf station, I turned and looked back, and I seen Mr. Brannon and the defendant across the other side of the highway, up in a yard.
When Williams took Patrolman Henderson's side arm, both officers took flight. Henderson ran over to a service station to take cover, and Brannon ran across the highway in the opposite direction. Williams chased after Brannon and yelled to Brannon, "Whoa, I gotta have your gun too." Brannon stopped and either dropped his gun or handed it over to Williams. When Patrolman Henderson noticed that Williams was after Brannon, he returned to the patrol car and retrieved a sawed-off shotgun. Henderson then took cover behind a nearby light pole. Williams stated that he feared for his life when he heard Patrolman Henderson load the shotgun, and thus he reacted by grabbing Brannon in a headlock. Williams had Brannon in a headlock in one hand with two pistols (Henderson's and Brannon's pistols) in the other hand. With Brannon under one arm and the guns in the other hand, Williams gradually made his way back to the vicinity of the patrol car where Henderson was positioned behind a light pole. Williams told Patrolman Henderson to drop his shotgun. Henderson did not comply, and for about ten minutes, there was a stand-off between Williams and Henderson which, again, consisted of more arguing.
Eventually, Patrolman Henderson told Williams that if he released Brannon he could just get his keys and leave. Williams picked up his keys and fishing gun from the seat of the patrol car. At this point, Williams allegedly had three guns and his keys in one hand and Brannon still in a headlock in the other. Williams then backed up to his Blazer, cranked it up, released Brannon and left the scene with all three guns (his own, Henderson's and Brannon's guns). After Oscar Williams *1377 made his escape, he deposited his passengers at their home and then proceeded on to his house. The other two occupants of the Blazer never spoke up, nor did they exit the vehicle at any time during all that transpired between Williams and the law enforcement officers.
Williams entered his home and went to the bathroom to check his face and wash away some of the blood. Williams was bleeding from the blows by the flashlight, and his glasses were also broken in the struggle. He left the two guns which belonged to the law officers in the bathroom out on the lavatory and stored his own gun in a dresser drawer.
Williams testified that he took the guns because he was afraid that the officers were going to kill him, and he simply wanted to disarm them. He stated that he had no intention of harming anyone. Further, he testified that he did not intend to steal the guns, and he only wanted to keep the guns away from Henderson and Brannon for a little while until things cooled down.
Next, Williams decided to go to a hospital to get sewn up. He got into his Blazer and proceeded on his way. After he had travelled only about two miles, he saw a state trooper. Williams knew that they were after him, and he panicked. He happened to be near a friend's house so he pulled in and went inside. By this time a platoon of law enforcement officers had spotted Williams, and they knew that he was in the house. One officer testified that as many as twenty-five (25) officers were on the scene and had surrounded the house. When Williams was ordered out of the house, he emerged with his hands in the air. Williams walked over to the Greene County sheriff and surrendered.
The sheriff, along with two other officers, transported Williams to the community where he lived. They first stopped at a next door neighbor's house. When Williams was first questioned about the location of the guns, he stated that he had thrown the guns away on the side of the road. But while the two officers were out of the car talking to the neighbor, Williams told the sheriff that the guns were right inside his house on the lavatory in the bathroom. The officers went inside and found the guns where Williams said they would be.
Williams was then transported to the sheriff's office where another attempt was made to administer an intoxilizer test, but it was unsuccessful. Williams had a hole in his lip from the flashlight blow, and he was unable to blow enough breath into the machine because blood kept bubbling out of the hole in his lip.

ANALYSIS

ISSUE I.

DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S MOTION TO PROVIDE A SPECIAL VENIRE?
Prior to the start of the trial, the attorney for Williams made a motion for a special venire, and the attorney alleged that he was unaware until the eve of trial that this was a capital case.
BY MR. JOHNSTON: Anyhow, we move the Court for special venire in this case and, in support of same, would show unto the Court that until yesterday at approximately 4:00 p.m. we were operating under the theory that it was an armed robbery case, and about 4:00 o'clock I received the instructions and was informed that it was going on a capital robbery and, as such, that's the reason that this motion had not been made prior to this morning. Since it's a capital robbery case, we're entitled to a special venire under Section 13-5-77 and it's to be granted upon demand and we're asking for it because of the fact that it is a  they are, the State is proceeding on a capital robbery case, which the jury would have to decide whether it's life imprisonment or not.
At trial, the State responded by noting that state law for an armed robbery conviction provided for life imprisonment. "[U]pon conviction, shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury... ." Miss. Code Ann. § 97-3-79 (Supp. 1991). Additionally, § 1-3-4 defines "capital case," "capital *1378 cases," "capital offense," "capital offenses," and "capital crime" as crimes and offenses punishable by death or life imprisonment. See Miss. Code Ann. § 1-3-4 (Supp. 1991). The State argued that the indictment clearly charged Williams with armed robbery which carries the possibility of life imprisonment. Therefore, how could Williams make the claim at this late hour that he was unaware that this was a capital case. Further, the State pointed out that Williams' motion for a special venire was not timely since such motion must be made well in advance of trial.
The judge overruled the motion for a special venire, finding, first of all, the motion came too late. The case was ready for trial at that moment. Second, this was the first day for a new jury which had not heard a case, and the judge found that as a practical matter, for all purposes and effect this was a special venire.
We find no abuse of discretion with the trial judge's denial of a special venire. This question is controlled by Sharplin v. State, 357 So.2d 940 (Miss. 1978). In Sharplin, the court had announced approximately two weeks prior to the first day of the April 1977 term of court at the docket setting that the case was ready for trial. The appellant filed a demand for a special venire on April 25, 1977, but the motion was not called to the trial judge's attention until the day of the trial, May 3, 1977. Sharplin, 357 So.2d at 941. All witnesses and parties were present and ready for trial. The motion was overruled for not being timely presented to the court, and this Court affirmed. Id. at 941. Under the rule of Porter v. State, 193 Miss. 774, 10 So.2d 377 (1942), the demand was not timely. Porter instructs that the demand for special venire "becomes due" when the court announces ready for trial.
When the court announced ready for trial, the request for a special venire became due without reference to the time then set for trial. It may be, as to which we express no opinion, that if the request is thereafter made in ample time for the special venire to be drawn, summoned, and to appear on the day set for trial, the request therefor should be granted.
Sharplin v. State, 357 So.2d 940, 941-42 (Miss. 1978) (quoting Porter v. State, 193 Miss. 774, 777-78, 10 So.2d 377, 378 (1942)). See also Tolbert v. State, 402 So.2d 871, 873 (Miss. 1981) (eve of trial is too late to request special venire). Furthermore, while state law and Uniform Criminal Court Rule 4.10, Request For Special Venire, do not impose a deadline per se for the demand for a special venire, both the Rule and state law clearly anticipate that the demand will be made well in advance of trial. See Miss. Code Ann. § 13-5-77 (Supp. 1991); § 99-15-27 (1991); Uniform Criminal Circuit Court Rule 4.10.
The appellant recognizes that he is facing a brick wall with his late request for a special venire, and he attempts to circumvent the problem by alleging fraud on the part of the State. He alleges that the State misled him into thinking that this was not a capital case up until 4:00 p.m. on the day before trial. The argument fails. The indictment left no room for doubt that the defendant was charged with armed robbery, a capital offense[2] which carries the possibility of life imprisonment. See Miss. Code Ann. § 97-3-79 (Supp. 1991).
To summarize, the motion for a special venire in the case at bar was not timely made. There was no abuse of discretion with the trial judge's denial of the motion. Tolbert v. State, 402 So.2d 871, 873 (Miss. 1981); Sharplin v. State, 357 So.2d 940, 941-42 (Miss. 1978); Porter v. State, 193 Miss. 774, 777-78, 10 So.2d 377, 378 (1942). A special venire could have been demanded for this case, provided the demand had been timely made. See Miss. Code Ann. § 13-5-77 (Supp. 1991); § 99-15-27 (1991); Uniform Criminal Circuit Court Rule 4.10.

*1379 ISSUE II.

WAS THE DEFENDANT ENTITLED TO A JURY INSTRUCTION CLAIMING SELF-DEFENSE UNDER THE CIRCUMSTANCES OF THIS CASE?
Williams was not charged with resisting arrest; assault  simple or aggravated; nor was he charged with the armed robbery of Henderson's firearm. Rather, the State charts an interesting course by charging Williams for the armed robbery of Brannon's firearm.[3]
On a charge of armed robbery, the State bears the burden of proving: (1.) that Williams feloniously took and carried away Brannon's firearm against his will by violence to his person or by putting Brannon in fear of immediate injury to his person by the exhibition of a deadly weapon; and (2.) that Williams took and carried away Brannon's firearm with the specific intent to steal. That is, the State was required to prove the specific intent to permanently deprive Brannon of his firearm rather than the intent to effect a temporary deprivation with the purpose of returning the gun at a later time. Lannom v. State, 464 So.2d 492, 495 (Miss. 1985); Stinson v. State, 375 So.2d 235, 236 (Miss. 1979); Thomas v. State, 278 So.2d 469, 471 (Miss. 1973). Miss. Code Ann. § 97-3-73, -79 (1972 & Supp. 1991).
The sum and substance of Williams' defense is that he took the guns from both officers in an attempt to extricate himself from harm, rather than with the intent to steal. Williams testified that he feared for his life after receiving two blows from the butt of Henderson's flashlight, and in this regard, Williams labels his theory of the case as "self-defense." He alleged that he took both guns with a purpose of disarming the officers in the midst of what had become a dangerous and heated confrontation. At trial, Williams explained that his intention was to keep the guns for only a little while until things had cooled down. Thus, Williams wages a formidable defense in alleging that he lacked an essential element of the crime of armed robbery  the specific intent to permanently deprive Brannon of his firearm.
It is fundamental in our system of jurisprudence that such questions of criminal intent are for the trier of fact to resolve. We do not sit in judgment of the jury. Rather, it is our task to evaluate the court's instruction to the jury to ensure that the jury was properly informed of the State's burden of proof in an armed robbery case. Specifically, was the jury clearly instructed that one element of the crime of armed robbery (i.e., the specific intent to permanently deprive the owner of his property), properly submitted to the jury under the instructions in this case? If the jury was so properly instructed, then it follows that the question of specific intent to steal was resolved against Oscar Williams. However, if the jury was not properly instructed, then it likewise follows that the jury was never afforded an opportunity to consider Williams' claim of reasonable self-defense.
Turning now to the jury instructions which were given for the case at bar, we find no fewer than three instructions which correctly defined the State's burden of proof regarding Williams' specific intent to steal.
First of all, instruction S-2B provided as follows:
The Court instructs the Jury that if you believe from the evidence presented in this case beyond a reasonable doubt that the Defendant, Oscar C. Williams, did on or about September 4th, 1988, in Greene County, Mississippi, unlawfully, wilfully *1380 and feloniously take from the person or from the presence of Robert Brannon, against his will, certain personal property of Robert Brannon, to-wit: a .357 Magnum Smith and Wesson handgun, by putting Robert Brannon in fear of immediate injury to his person by the exhibition of a deadly weapon, to-wit: a pistol, with the intent to permanently deprive Robert Brannon of his handgun, then in that event it shall be your sworn duty to find the Defendant guilty of Armed Robbery.
(emphasis added).
Additionally, the trial judge granted two instructions requested by Williams which addressed the intent to steal.
JURY INSTRUCTION D-2
* * * * * *
The essential elements of robbery are: (1) Felonious intent, that is, the specific intent to steal and to permanently deprive the owner of his property and (2) Force or putting in fear as a means of acting upon the intent, and (3) Then taking, stealing, and carrying away the property of another from his person or in his presence with the specific intention to permanently deprive the owner of his property.

The specific intent to steal, that is, the specific intent to permanently deprive the owner of his property is an indispensable element of robbery. The issue of specific intent is a question for the Jury.
* * * * * *
If you find that the State has failed to prove beyond a reasonable doubt that OSCAR WILLIAMS specifically intended to steal and to permanently deprive ROBERT BRANNON of his property, then it is your sworn duty to find for Defendant OSCAR WILLIAMS upon the charge of Robbery with a Deadly Weapon and to return a verdict of "Not Guilty".
(emphasis added).
Finally, the court granted instruction D-4 which allowed the jury to consider Williams' theory of resisting arrest as an alternative to the intent to rob.
The Court instructs the Jury that resisting arrest is not evidence of the specific intention required to be proven beyond a reasonable doubt as an element of a charge of Robbery.
* * * * * *
If you find that Defendant OSCAR WILLIAMS was resisting arrest and without the specific intention to rob another, then it is your sworn duty to find for the Defendant OSCAR WILLIAMS upon the charge of Armed Robbery with a Deadly Weapon and to return a verdict of "Not Guilty".
(emphasis added).
As the foregoing illustrates, the jury was liberally informed that in order to find Williams guilty of armed robbery, it must conclude that he took the gun with the specific intent to permanently deprive Brannon of its use. Williams' "self defense" instruction,[4] which the trial court denied, added nothing new to his theory of the case.
We find the case of Thomas v. State, 278 So.2d 469 (Miss. 1973), to be applicable to the case sub judice. In Thomas, the appellant disarmed two officers at gunpoint and drove them to a wooded area where he handcuffed both officers to a tree. Thomas, *1381 278 So.2d at 470. Thomas then proceeded to the police firing range where he surrendered a pistol and the patrol car to pursuing law officers. Thomas, 278 So.2d at 470. In Thomas, the specific question was whether or not the phrase, "feloniously take, steal," was sufficient to inform the jury that an indispensable element of the crime was the specific intent to permanently deprive another of his property. Thomas, 278 So.2d at 471.
We have held that when the issue is raised as to the intent and purpose of the taking, a more comprehensive definition is required. In Thomas, supra, we stated:
A taking of personal property with felonious intent is an essential element of the offense of armed robbery, of attempt to commit armed robbery, and of common law robbery. The court must so instruct the jury in every robbery case, and must in some sufficient form explain and define the term "felonious intent." The extent of the definition required depends upon the evidence in the particular case. State v. Spratt, N.C., [265 N.C. 524] 144 S.E.2d 569. In some cases, as where the defense is an alibi or the evidence develops no direct issue or contention that the taking was under a bona fide claim of right or was without any intent to steal, "felonious intent" may be simply defined as an "intent to rob" or "intent to steal." State v. Spratt, supra. On the other hand, where the evidence raises a direct issue as to the intent and purpose of the taking, a more comprehensive definition is required. State v. Lawrence, 262 N.C. 162, 136 S.E.2d 595; State v. Lunsford, 229 N.C. 229, 49 S.E.2d 410. 144 S.E.2d at 574.
Thomas, 278 So.2d at 473. (emphasis added).
Returning now to the case at bar, we find that Williams' jury received no fewer than five explanations that the "intent to steal" meant the intent to permanently deprive another of his personal property. Clearly, Williams received the more comprehensive definition which Thomas demands. Furthermore, we note that Williams' D-4 instruction, "resisting arrest," is very similar to the one which we endorsed in Thomas v. State, 278 So.2d 469, 472 (Miss. 1973).

CONCLUSION
We find no abuse of discretion in the trial judge's denial of Williams' motion for a special venire and no error in the court's refusal to grant instruction D-1. Therefore, we affirm Williams' conviction for armed robbery entered by the Greene County Circuit Court by order dated June 14, 1989, and sentence of five years to the Mississippi Department of Corrections.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BANKS, JJ., concur.
McRAE, J., dissents without written opinion.
NOTES
[1] This would be what is commonly referred to as the portable test. The portable machine is not systematically calibrated and tested as required under state law. See Miss. Code Ann. § 63-11-19 (Supp. 1991). Its purpose is to aid the officer in determining probable cause. If .10 or more is registered on the portable machine, then the officer transports the subject to a local law enforcement office where the calibrated test is administered anew.
[2] We are compelled to note an interesting position which the State adopts on appeal. Citing Ex Parte Dennis, 334 So.2d 369 (Miss. 1976), the State argues that armed robbery is not a capital offense in Mississippi, a position which directly conflicts with the State's position at trial. Suffice it to say that armed robbery is a capital offense in Mississippi. See Marks v. State, 532 So.2d 976, 979 (Miss. 1988); Miss. Code Ann. § 1-3-4 (Supp. 1991).
[3] That Oscar C. Williams late of the County aforesaid ... unlawfully, wilfully and feloniously commit an assault upon the person of Robert Brannon with certainly deadly weapon, to-wit: a gun and did then and there feloniously put him, the said Robert Brannon in fear of immediate injury to his person by the exhibition of the said deadly weapon as aforesaid, and with the unlawful felonious intent to steal, he the said Oscar C. Williams did then and there unlawfully, wilfully and feloniously take, steal and carry away from the person and in the presence of and against the will of the said Robert Brannon certain personal property to-wit: .357 Magnum, Smith & Wesson a/handgun, a better description being to your grand jurors unknown, of the personal property of Robert Brannon.
[4] D-1
The Court instructs the jury that a person has a right to use reasonable force to resist and to protect himself or another person against unwarranted or unjustified attacks or imminent danger of great physical injury. This right is generally called "self-defense".
If you find that TOMMY HENDERSON or ROBERT BRANNON made an unwarranted or unjustified attack upon Defendant OSCAR WILLIAMS to cause Defendant OSCAR WILLIAMS imminent danger of great physical injury and that Defendant OSCAR WILLIAMS used reasonable force to resist the attack or to protect himself against imminent danger of great physical injury by TOMMY HENDERSON or ROBERT BRANNON, then Defendant OSCAR WILLIAMS lawfully exercised HIS right to "self-defense" and it is your sworn duty to find for Defendant OSCAR WILLIAMS and to return a verdict of "not guilty".