## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 1998-DP-01785-SCT

*WILLIAM GERALD MITCHELL a/k/a WILLIAM JERALD MITCHELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/24/1998 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KEITH PISARICH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 03/29/2001 |
| MOTION FOR REHEARING FILED: | 5/4/2001; denied and opinion modified beginning at paragraph 59 8/23/2001 |
| MANDATE ISSUED: | 8/30/2001 |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. William Gerald Mitchell was originally indicted as a habitual offender on July 25, 1996, by the Grand Jurors of the Second Judicial District of Harrison County for the November 21, 1995, capital murder of Patty Milliken, while Mitchell was under a sentence of life imprisonment, in violation of Miss. Code Ann. § 97-36-19(2)(e). On July 21, 1998, the trial judge granted a nolle prosequi for the indictment due to an error contained within the indictment.

¶2. On April 29, 1998, William Gerald Mitchell was indicted as a habitual offender by the Grand Jurors of the Second Judicial District of Harrison County for the November 21, 1995, capital murder of Patty Milliken, while Mitchell was under a sentence of life imprisonment, in violation of Miss. Code Ann. § 97-36-19(2)(b). Mitchell was arraigned and pled not guilty on June 4, 1998.

¶3. On July 23, 1998, the jury found Mitchell guilty of capital murder. A hearing regarding Mitchell's status as a habitual offender was held, and the trial judge ruled that Mitchell was a habitual offender. The sentencing hearing was held July 23, 1998, where the jury imposed the death penalty. The trial court stayed Mitchell's execution. Mitchell's post-trial motions were denied in November, 1998. Mitchell appeals, raising twelve issues for consideration by this Court.

### STATEMENT OF THE FACTS

¶4. The last time that Patty Milliken was seen alive was at the conclusion of her shift at 8:00 p.m., November 21, 1995, at the Majik Mart on Popps Ferry Road in Biloxi, Mississippi. She told her co-worker, James Leland Hartley, that she was going outside to smoke and talk to William Gerald Mitchell and that she would return shortly. Before following Mitchell outside, she telephoned her son, telling him she would be home in approximately fifteen minutes. She also left her keys in the safe to initiate a 10-minute time-released unlock and her purse and other personal items on the counter. Patty Milliken's body was found the following morning under a bridge. She had been beaten, strangled, sexually assaulted, crushed by being driven over, and mutilated.

¶5. The record shows that on November 21, 1995, Hartley saw Mitchell enter the store three separate times to visit Milliken while she was working her shift. Hartley overheard Milliken refer to Mitchell by the name of "Jerry." At the end of Milliken's shift that evening, around 8:00 p.m., Milliken and Hartley realized that they had forgotten to document the amount of cash they had placed in the safe that night. Milliken opened the safe and telephoned her son that she would be home in fifteen minutes. At approximately 8:05 p.m. Milliken decided to walk out of the store with Mitchell and told Hartley that "she'd be outside smoking a cigarette if [Hartley] needed her and that she'd be right back."

¶6. Milliken left her keys in the lock on the safe, cigarettes and lighter on one counter, and her purse on another counter. Hartley testified that it was odd for Milliken to go outside to smoke because employees were authorized to smoke inside the store. Ten minutes after Milliken had gone outside, Hartley walked outside to ask her a question, but she was not there. Her belongings were still inside the store, and her car remained in the parking lot. Hartley telephoned Milliken's home and learned that she had not been in contact with her family. When Milliken had still not returned by 10:00 p.m., Hartley telephoned the police.

¶7. When the police arrived, Hartley gave them Milliken's purse and showed them where she had written Jerry's phone number. The police cross-referenced the telephone number to a physical address, and proceeded to 323 Croesus Street. The police arrived at the residence at approximately midnight.

¶8. Officers Matory and Doucet went to the front door, and Officer McKaig "was on the right side of the house approaching the rear." McKaig saw Mitchell, and Mitchell asked, "Who's that?" McKaig identified himself as a police officer and explained that he wanted to speak to him. Mitchell ran, and a pursuit on foot followed.

¶9. Captain Anderson responded to assist with the foot pursuit. Captain Patterson, arriving to assist with the foot pursuit, spoke with Booker Gatlin, Mitchell's grandfather and owner of the residence on Croesus Street. Gatlin indicated that "Jerry" was William Gerald Mitchell, and that he drove a blue Grand Am.

¶10. When the foot pursuit proved unsuccessful, the Biloxi Police Department issued a be-on-the-lookout ("BOLO") for Mitchell and his vehicle. Shortly thereafter, an officer spotted Mitchell getting gas at a Shell station located on U.S. Highway 90. When Mitchell noticed the police car, he threw down the gas nozzle he was using and sped away in his vehicle. Patrolman Sonnier took part in the pursuit of Mitchell. That evening he had a television camera crew riding with him, and they were able to film most of the pursuit. Sonnier testified that Mitchell was the driver of the vehicle and that Curtis Pearson was his passenger. The high-speed chase ended in Mitchell being arrested for various traffic violations. Mitchell's passenger, Pearson, testified that, during the chase, Mitchell stated 2-3 times that he "got that bitch."

¶11. Officer Heard of the Biloxi Police Department discovered the mutilated, almost naked body of Patty

Milliken under the Popps Ferry Bridge at 7:14 a.m. the following morning. Officer Robert Burriss arrived at the scene at approximately 7:30 a.m., and worked the scene until 2:00 p.m. Burriss testified that he found Milliken's body on its back. She had part of a shirt sleeve around her right arm and part of her bra around her left arm, with only a pair of white socks clothing her body. Her body was bruised and scraped, and her head was "burst open" with the brains "spilling out of the skull, scattered about on the yard, and there (sic) was also some of the brain matter stuck on her back."

¶12. There were "numerous" tire tracks "back and forth all over that area;" tracks that were similar to the ones found on Milliken's body. Testing would ultimately show that the tire casts from the area matched three of the four tires on Mitchell's car with regard to tread design, size and "overall width."

¶13. Later that day, pursuant to a search warrant, Burris also collected evidence from Mitchell's car. Burriss made a diagram of the car indicating where he found "various pieces of blood and hair on the automobile." Burris found hair and blood on the passenger door; blood underneath the fender and body of the car, as well as on the catalytic converter; and blood spatters in three of the wheel wells. Milliken's broken lower dentures were also found in Mitchell's car.

¶14. After Mitchell's arrest for traffic violations, he was taken to the Biloxi Police Department. Mitchell was initially interviewed by Sergeant Torbert and Investigator Thompson. Later, Officers Newman and Peterson interviewed Mitchell at 1:07 p.m. on November 22, 1995, the same day Milliken's body was found. At the time of this second interview, Mitchell had not been arrested or charged with murder, but was in custody for the traffic violations. Mitchell said that he was the only one to use his vehicle that night. Mitchell claimed that Milliken was alive when he left her, though he did admit that he had hit her hard enough in the nose that "blood just flew everywhere." A redacted version of Mitchell's second interview was admitted during the trial. The tape was edited and redacted at the point before Mitchell made any statement that he killed or was responsible for the death of Milliken.

¶15. After Mitchell's second interview, Mitchell was booked on the charge of murder and transported to the Harrison County Jail. Prior to his transfer, a suspect rape kit was performed on Mitchell at the Biloxi Regional Medical Center. Later, search warrants were secured and executed on Mitchell, Mitchell's car, and Mitchell's residence at 323 Croesus Street in Biloxi.

¶16. Dr. Paul McGarry performed the autopsy on Milliken's body. According to McGarry, Milliken was strangled, beaten, sexually assaulted, and repeatedly run over by a vehicle. McGarry stated that the damage to Milliken's larynx cartilages and hemorrhagic airway proved that she had been strangled. There were also semicircular marks from her attacker's fingernails on her neck. She was beaten to the point that her lower denture was broken and expelled. Her face was swollen and purple which "would evidence that hard blows had been delivered to the head." Analysis of the genital area displayed "the kind of injuries that are produced by stretching and tearing of the delicate lining of the vagina" which McGarry "interpreted as forceful penetration enough to damage the tissue and tear and rub off surfaces of the tissue, to stretch the opening. The anus was even more so damaged." McGarry confirmed that Milliken's sexual injuries occurred while she was still alive.

¶17. McGarry also testified to finding five tire tracks across the victim's body. According to McGarry, Milliken apparently lived long enough to experience the crushing injuries that ruptured her kidney, liver, and spleen; broke almost every rib; broke her spine; broke her collarbone; and, tore open her lungs and heart vessels. Milliken was killed when her "brain [was] blown out by crushing and squashed out." The brain was

expelled up to four feet from an opening at the top of her head measuring eight inches in diameter.

¶18. At the time of Milliken's savage murder, Mitchell had been paroled for approximately eleven months from a sentence of life in prison for murder.

## DISCUSSION

### I. CAN AN INDICTMENT BE RETURNED AGAINST A DEFENDANT WHILE A PRIOR INDICTMENT CHARGING THE SAME OFFENSE IS STILL ACTIVE AND PENDING?

¶19. On July 25, 1996, William Gerald Mitchell was indicted as a habitual offender by the Grand Jurors of the Second Judicial District of Harrison County for the November 21, 1995, capital murder of Patty Milliken, while Mitchell was under a sentence of life imprisonment, in violation of Miss. Code Ann. § 97-3-19(2)(e). At a hearing held November 13, 1997, the trial judge noted a scrivener's error in the indictment in that Mitchell had been charged under the wrong subsection of the capital murder statute. This first indictment, Cause No. 96-263, while specifically citing Miss. Code Ann. § 97-3-19(2)(b) in its heading, referred to the felony-murder section of the Miss. Code § 97-3-19(2)(e) and contained language "with or without deliberate design." The trial judge commented that "it ought to be cleaned up if it is a Scribner's [sic] error." Subsequently, on April 29, 1998, William Gerald Mitchell, a/k/a William Jerald Mitchell, was indicted as a habitual offender by the Grand Jurors of the Second Judicial District of Harrison County for the November 21, 1995, capital murder of Patty Milliken, while under a sentence of life imprisonment, in violation of Miss. Code Ann. § 97-3-19 (2)(b).

¶20. On July 21, 1998, the trial court granted a motion by the State to nolle prosequi the first indictment. This nolle prosequi came about as a result of defense counsel making a motion to dismiss Mitchell's second indictment, Cause No. 98-195, because the first indictment, Cause No. 96-263, was still active and pending. This motion was made immediately after the jury was impaneled and sworn in. The trial judge denied the defense's motion to dismiss. It was after the motion was denied that the State made an ore tenus motion to nolle prosequi the first indictment, which, against opposition of defense counsel, was granted.

¶21. After the motion to nolle prosequi was granted, the district attorney stated:

> And we further would say to the record that that is the same case and all material points, some name's changed and better tracks the statute as the present-- that the case that we're involved in today B-2402-98-00195, being the capital murder indictment against William Gerald Mitchell a/k/a William Jerald Mitchell which was filed on April 29th, 1998. And the defense has been--was made aware of it at that time, and in fact all--I'll say this to make clear in the record, there was no confusion no disadvantage to the defense by the action that was taken because all of their motions since that time, all the correspondence since that time, all of the record entries since that time, not only by the prosecution but by the defense starting with its filing on June 3rd, 1998, have been with the current number, the number under which we proceed today, as announced by the Court numerous times.

¶22. Mitchell contends that the trial court erred in denying his motion to dismiss the second indictment at a time when the first indictment was still pending and had not been nolle prosequi or dismissed. Mitchell asserts that the grand jury should not have been allowed to consider or return the second indictment against him while his first indictment was still active and pending.

¶23. The State maintains that because there was a nolle prosequi of the first indictment, the trial that ensued under the second indictment was proper.

¶24. Whether a second indictment on a charge contained within the first indictment can be returned against a defendant while the first indictment is active and pending is a matter of first impression for this Court. However, *Wilson v. State*, 574 So.2d 1324, 1332 (Miss. 1990), supports the proposition that there is no double jeopardy violation when a second indictment is returned by a grand jury, and then the prosecution successfully moves the court to enter a nolle prosequi motion regarding the first indictment. The first indictment in *Wilson* resulted in a mistrial when the jury could not agree on a verdict. The defense filed a motion to quash the second indictment alleging that Wilson was facing double jeopardy, which was denied. *Id*. The difference between *Wilson* and the case at hand is that in *Wilson*, the prosecution had secured a court order granting the nolle prosequi for the first indictment prior to the second trial, while in the instant case Mitchell actually had two active indictments pending against him after the jury had been impaneled, and opening statements by the State had been made. The trial was in progress when Mitchell's counsel was allowed to make the motion to dismiss, although it appears from the record that Mitchell's counsel attempted to make the motion before the State's opening statements began. The trial judge decided to hear the motion when the jury had gone to lunch.

¶25. What must be determined is whether Mitchell actually incurred any harm from having simultaneous indictments against him. Was Mitchell subjected to multiple prosecutions in this case, and was he aware of the grounds for the prosecution against him? The record indicates that he suffered no harm by having the simultaneous indictments. The fact that defense counsel submitted motions and requests for discovery to the court with the cause number from the second indictment shows that there was an awareness that the State was pursuing prosecution under the second indictment. However, it should be noted that during this time period Mitchell also submitted, pro se, several motions that were duplicative in nature to what his counsel had submitted, and that these referenced the cause number from the first indictment.

¶26. Also, Mitchell was subject to only one prosecution, only one trial. In *Warren v. State*, 709 So.2d 415, 418 (Miss. 1998), this Court ruled that there was not a double jeopardy violation when a trial was aborted because a witness's testimony for the prosecution did not support the elements set out in the indictment and the defendant was subsequently re-indicted. Mitchell argues that because the State was barred in *Warren* from charging the same offense in Count II on the basis that it violated double jeopardy, the same should apply in the present case. Mitchell is incorrect in this assertion. Mitchell was not subjected to an actual trial or even an "aborted" trial, as was the case in *Warren*. Instead Mitchell attempted to make his motion before opening statements began; was told by the Judge that his motion would be reserved until the jury had gone to lunch; and then made his motion to dismiss before the prosecution had even called its first witness.

¶27. Any error from the issuance of the second indictment before nolle prosequi of the first indictment occurred was clearly harmless. This issue is without merit.

## II. DID THE TRIAL COURT ERR WHEN IT ALLOWED THE PROSECUTION TO AMEND THE INDICTMENT?

¶28. During motions that were heard on June 4, 1998, the State realized that it had failed to include two felony convictions for assault and battery with intent to maim, which Mitchell had previously been sentenced to five years in prison, in the indictment. The trial judge asked for a written motion from the State, and

authorized defense counsel to respond to the proposed amendment. The prosecution filed its motion to amend the indictment with the circuit clerk on June 8, 1998. The trial judge granted the amendment with an order indicating that the indictment was amended pursuant to an ore tenus motion from the State's prosecutor.

¶29. Mitchell contends that the trial court erred in signing an order allowing the State to amend the indictment without allowing the defense to respond. Mitchell asserts that he was denied his right to due process when not afforded the opportunity to be heard regarding the motion.

¶30. Mitchell, in his reply brief, maintains that the discussion regarding the proposed amendment held on June 4, 1998, did not constitute notice that the State was going to amend the indictment. Mitchell also asserts that the State's motion to amend indictment was not noticed to him and that a certificate of service was not provided to Mitchell or his attorneys. The record does not contain a certificate of service showing that Mitchell or his counsel were presented with a copy of this motion. Mitchell believes that this is a violation of Rule 2.06 of the Uniform Circuit and County Court rules which states as follows:

> Unless otherwise ordered by the court, all pleadings, motions, or applications to the court, except the initial pleading or indictment, must be served by any form of service authorized by Rule 5 of the Mississippi Rules of Civil Procedure on all attorneys of record for the parties, or on the parties when not represented by an attorney, and the person filing same shall also file an original certificate of service certifying that a correct copy has been provided to the attorneys or to the parties, the manner of service, and to whom it was served. Except as allowed by this rule or allowed by the court for good cause shown, the clerk may not accept for filing any document which is not accompanied by a certificate of service.

U.R.C.C.C. 2.06. Mitchell contends that the fact that the court order was signed on June 4, 1998 but not entered until June 18, 1998, combined with the absence of a signature for Mitchell's counsel, shows that he was not given notice or permission to respond to the proposed amendment. Mitchell asserts that he should have, in the least, been arraigned on the new amended indictment.

¶31. The State claims that the indictment was properly amended to charge Mitchell as a habitual offender under Rule 7.09 of the Uniform Circuit and County Court Rules, which provides as follows:

> All indictments may be amended as to form but not as to the substance of the offense charged. Indictments may also be amended to charge the defendant as an habitual offender or to elevate the level of offense where the offense is one which is subject to enhanced punishment for subsequent offenses and the amendment is to assert prior offenses justifying such enhancement (e.g., driving under the influence, Miss. Code Ann. § 63-11-30). Amendment shall be allowed only if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised.

U.R.C.C.C. 7.09. The State contends that Mitchell cannot claim he was unfairly surprised by the addition of his other convictions to the indictment because Mitchell was charged with capital murder as a habitual offender from the very outset of the case. *Burrell v. State*, 726 So.2d 160, 162 (Miss. 1998), noted that "although 7.09 does authorize amendments to charge the defendant as an habitual offender under § 99-19-83, this Court held in *Nathan v. State*, 552 So.2d 99, 106-07 (Miss.1989) that § 99-19-83 only affects sentencing and does not affect the substance of the offense charged." *Evans v. State*, 725 So.2d 613, 681 (Miss. 1997), holds that "the test for determining whether an indictment will prejudice the defendant's case

is 'whether a defense as it originally stood would be equally available after the amendment is made.'" (quoting *Griffin v. State*, 540 So.2d 17, 21 (Miss. 1989)).

¶32. While the amendment to the indictment may not have been correctly made in terms of procedure, it certainly did not place Mitchell in any worse position than before the amendment was made. It only served to add convictions which in no way changed the substance of the indictment. *Gray v. State*, 605 So.2d 791, 793 (Miss. 1992) states that "habitual offender status is not a crime, in and of itself, but merely a status which, if proven, will enhance the sentence imposed for the conviction of the offense." In the present case we are not considering an amended indictment that was being made to lift the defendant to the level of "habitual offender." Instead we see a situation where a prosecutor sought to correct an omission of two felonies that should have been included in the original indictment. The court's error in not allowing the defense to respond is harmless, rendering this issue without merit.

### III. DID THE TRIAL COURT ERR IN REFUSING TO GRANT DEFENDANT'S MOTION FOR A SPECIAL VENIRE, AND/OR, TO GRANT A CONTINUANCE TO THE DEFENDANT?

¶33. Mitchell's counsel, before trial, filed a motion for special venire. The trial judge was notified of the request during the June 4, 1998, court hearing. Mitchell's counsel announced to the trial judge that he would either file a withdrawal or pursue the motion on June 8, 1998, upon which the trial judge reserved the motion. Approximately 2-3 weeks before trial, the trial judge instructed his court administrator to contact defense counsel to determine the status of the request for a special venire.

¶34. On June 17, 1998, a motion for continuance was discussed, during which the defendant's motion for special venire was ruled upon. Defense counsel acknowledged at the motion for continuance that he had informed the court administrator that the special venire request would be waived. Defense counsel then explained to the trial judge that subsequent to counsel's waiving of special venire, Mitchell was insisting that he have a special venire for his case. The trial court ruled that the demand for special venire was untimely and that Mitchell had waived his right to demand a special venire.

¶35. Mitchell now argues that a continuance should have been granted by the trial court for the purpose of summoning a special venire. Mitchell believes that because he did not personally agree to the withdrawal of the request for special venire that the withdrawal was not valid. Mitchell fails to cite any authority for this proposition causing consideration of this issue to be procedurally barred. *Holland v. State*, 705 So.2d 307, 329 (Miss. 1997).

¶36. In addition, this issue is without merit. Any person charged with a capital crime, or with the crime of manslaughter, that has been arraigned and has entered a plea of not guilty is entitled to a special venire upon demand. Miss. Code Ann. § 13-5-77 (Supp. 2000). The standard of review regarding a denial of a motion for a special venire comes from *Davis v. State*, 684 So.2d 643, 650 (Miss. 1996), which states, "this Court will not overrule the lower court's denial of a motion for special venire except upon a showing of abuse of discretion." The movant for special venire must make the request for special venire in a timely fashion. *Id*. (citing *Williams v. State*, 590 So.2d 1374 (Miss. 1991)). It is also the responsibility of the movant to bring the motion to the attention of the trial court, otherwise the issue will be considered waived. *Billiot v. State*, 454 So.2d 445, 456 (Miss. 1984).

¶37. In the present case, the trial judge did not abuse his discretion when he determined that the motion for

special venire was untimely and that the right to demand a special venire had been waived. The defense gave every indication that it did not intend to pursue having a special venire until the Friday before this case was set to begin on the following Monday, rendering the request for special venire untimely and waived.

### IV. WAS AN ILLEGAL WARRANTLESS ARREST OF MITCHELL MADE BY LAW ENFORCEMENT PERSONNEL? IF SO, DID THE TRIAL COURT ERR IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS?

¶38. Mitchell argues that his arrest was without probable cause and that the court erred in denying his motion to suppress statements and derivative evidence obtained from the arrest.

¶39. Two pursuits of Mitchell occurred before he was arrested. The first took place on foot as he ran from his residence. The second was a high speed chase as police pursued Mitchell in his car.

¶40. The facts known to the police prior to their decision to question Mitchell at his home were as follows: (1) Milliken had worked the 4:00-8:00p.m. shift at the Majik Mart on November 21, 1995; (2) surveillance video at the store showed Mitchell coming into the store three different times that day talking to Milliken; (3) Milliken's coworker saw Milliken write down Mitchell's telephone number in her address book; (4) Milliken telephoned her son to inform him she would be home in fifteen minutes; (5) Milliken had left her personal belongings inside the store and stated that she was going outside to smoke a cigarette with Mitchell; (6) Milliken walked with Mitchell out of the store; (7) ten minutes later, Milliken's coworker stepped outside to ask her a question and realized that she was gone; (8) Milliken's car was still parked at the store; (9) two hours after Milliken had gone outside with Mitchell, she had still not returned, her personal effects were still at the store, and she had not gone home; (10) Milliken's coworker had called the police concerned about Milliken's whereabouts; (11) Milliken's coworker had told the police about Mitchell's visits, showed them the surveillance video, and Mitchell's telephone number in Milliken's purse; (12) the police had cross-referenced the telephone number, learned of Mitchell's address, and proceeded to 323 Croesus Street to see if Mitchell knew of Milliken's whereabouts.

¶41. The test for probable cause in Mississippi is the totality of the circumstances. *Haddox v. State*, 636 So.2d 1229, 1235 (Miss. 1994). This Court has defined probable cause as:

> a practical, nontechnical concept, based upon the conventional consideration of every day life on which reasonable prudent men, not legal technicians act. It arises when the facts and circumstances with an officer's knowledge, or of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.

*Conway v. State*, 397 So.2d 1095, 1098 (Miss. 1980) (quoting *Strode v. State*, 231 So.2d 779 (Miss. 1970)). An officer's knowledge before the pursuit is determinative of probable cause. *Riddles v. State*, 471 So.2d 1234, 1236 (Miss. 1985).

¶42. Considering the facts and circumstances under which Milliken disappeared, it was not unreasonable for the officer to form a belief that a crime against Milliken had occurred. The information that was provided to the police seemed reasonable and trustworthy enough to connect Mitchell to the possible abduction.

¶43. There are three valid police tactics to investigate a possible crime as set out by this Court in *Nathan v. State*, 552 So.2d at 103:

(1) Voluntary Conversation: An officer may approach a person for the purpose of engaging in a voluntary conversation no matter what facts are known to the officer since it involves no force and no detention of the person interviewed; (2) Investigative Stop and Temporary Detention: To stop and temporarily detain is not an arrest, and the cases hold that given reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest; (3) Arrest: An arrest may be made when the officer has probable cause.

(citing *Singletary v. State*, 318 So.2d 873, 876 (Miss. 1975)).

¶44. The officers in the present case chose to approach Mitchell and attempt to engage him in voluntary conversation, although they could have just as legally stopped and detained Mitchell. "Under the Fourth Amendment, police officers with reasonable suspicion that an individual has committed or is about to commit a crime may detain that individual, using some force if necessary, for the purpose of asking investigative questions." *Kolender v. Lawson*, 461 U.S. 352, 367, 103 S.Ct. 1855; 75 L.Ed. 2d 903 (1983).

¶45. Officer McKaig found Mitchell standing in his back yard. McKaig identified himself and explained to Mitchell that he wanted to ask him some questions. Mitchell ran, ignoring McKaig's order to halt. Minutes later, Mitchell also ignored an order to halt when Officer Doucet saw Mitchell on Reynoir Street. Each of these orders to halt were legitimate under the law. Officers are permitted to stop and temporarily detain citizens for questioning when there is suspicion and/or arrest a citizen when probable cause exists. *Nathan*, 552 So.2d at 103 (citing *Singletary*, 318 So.2d at 876).

¶46. Here, the requisite suspicion existed to allow the officers to stop and detain Mitchell temporarily for questioning. Once he fled the officers and ignored their commands to halt, the officers, already possessing a reasonable suspicion, also obtained probable cause. This is consistent with *Sibron v. New York*, 392 U.S. 40, 66-67, 88 S.Ct. 1889, 20 L.Ed. 2d 917 (1968), which states "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."

¶47. Mitchell argues that his arrest began when McKaig spoke to Mitchell in his backyard, in accordance with *Pollard v. State*, 233 So.2d 792 (Miss. 1970); *Terry v. State*, 252 Miss. 479, 173 So.2d 889 (1965); and *Smith v. State*, 240 Miss. 738, 128 So.2d. 857 (1961). However this pursuit did not result in arrest. Instead it resulted in the police issuing a be-on-the-lookout ("BOLO") for Mitchell. Mitchell's argument that an arrest resulted from the events in Mitchell's backyard is incorrect.

¶48. After the BOLO had been issued on police radio, Officer Dawson, traveling in a marked police car, viewed a man and car fitting the description getting gasoline at a Shell station. As Dawson approached the gas station, Mitchell threw down the gas nozzle and sped away. Dawson stated that he immediately began following Mitchell's vehicle, but did not put on his lights and siren until he observed Mitchell run a red light on another street. Mitchell was eventually arrested for disturbing the peace, reckless driving, and resisting arrest.

¶49. This Court held in *Ott v. State*, 722 So.2d. 576, 582 (Miss. 1998), that "an officer may make a warrantless arrest based on his own personal observations or based on communications with other

officers." In this case, Officer Dawson relied on the BOLO that had been issued and his observance of Mitchell at the gas station. Dawson stated "(w)hat was going through my mind at that time is I'm looking for this vehicle, the other officers are wanting to talk to this guy, when he sees me he takes off..."

¶50. Probable cause to arrest Mitchell existed when he received the BOLO and subsequently viewed Mitchell's vehicle matching the description. *Hamburg v. State*, 248 So.2d 430 (Miss. 1971). Coupled with Mitchell's reaction by fleeing and stealing gas, Dawson had sufficient probable cause to pursue and arrest Mitchell.

¶51. The Biloxi Police Department had probable cause to arrest Mitchell at the outset of both pursuits that occurred. Accordingly, the trial judge did not err in denying the motion to suppress.

### V. DID AN ILLEGAL TRESPASS BY LAW ENFORCEMENT PERSONNEL TAKE PLACE PRIOR TO THE ARREST OF THE DEFENDANT? IF SO, DID THE TRIAL COURT ERR IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS?

¶52. Mitchell asserts that the police officers made an illegal trespass onto the property where he was staying, and, as a result, evidence taken from his person and his car should have been suppressed by the trial court. Mitchell contends that, but for the illegal trespass he claims occurred, he would not have fled. Mitchell also asserts that evidence retrieved off of Mitchell's person and his car is directly attributable to Officer McKaig's initial trespass.

¶53. Once the police realized that Milliken seemed to have disappeared, Patrolmen McKaig, Doucet, and Matory visited Booker Gatlin's home (Mitchell's grandfather), where Mitchell had been residing. Officer Doucet instructed McKaig to go watch the back door, while he and Matory went to the front door. McKaig stated in his testimony that he was not given permission by an owner or occupant to go onto the property. As McKaig walked along the side, around to the rear of the house, he encountered Mitchell. Mitchell noticed him and asked who was there. McKaig responded by stating that it was the police and that he just wanted to talk to him. Mitchell then fled.

¶54. Mitchell contends that this constituted an illegal trespass on the part of the police. Mitchell refers to *Davidson v. State*, 240 So.2d 463 (Miss. 1970), where this Court determined that a game warden had committed trespass when he entered upon Davidson's land to inspect a tractor. The warden then turned over information to the sheriff, who obtained a search warrant to go on the land where it was then determined that the tractor was stolen. *Id*. This Court ruled that the subsequent search by the sheriff was illegal because it was based on information illegally obtained by the warden. *Id*. at 463-64. The Court stated that "the right to be free from an illegal search and seizure is a right which the courts must vigilantly protect." "This right to be secure from invasions of privacy by government officials is a basic freedom in our Federal and State constitutional systems." *Id*. at 464.

¶55. Mitchell's reliance on *Davidson* is not well-founded. The holding in *Davidson* is that a search warrant cannot be sworn and executed based upon information that was obtained through an illegal trespass. *Id*. *Davidson* and the case at hand are easily differentiated. In *Davidson*, the warden was not on the land because of a possible theft of a tractor, whereas in the instant case the police were under the belief that Mitchell was the last person who had seen Milliken and were aware that she had disappeared under curious circumstances. Also the police in the present case did not gather evidence from Mitchell's car or clothing while on the premises to ask him questions. Only after other information was amassed through questioning

of Mitchell and the discovery of Milliken's body, did the police obtain search warrants for Mitchell's body and vehicle.

¶56. This Court, in **Waldrop v. State**, 544 So.2d 834, 838 (Miss. 1989), determined that a claim of police trespass cannot be made regarding areas that are typically used by visitors. This Court stated:

> It is not objectionable for an officer to come up upon that part of the property which has "been open to the public common use." The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route "for the purpose of making a general inquiry" or for some other legitimate reason, they are free "to keep their eyes open..."

(citing 1 W. LaFave, *Search and Seizure*, § 2.3, at 318 (1978)). This Court continued quoting LaFave by stating:

> Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.

*Id*. The United States Supreme Court has also said that if property is exposed to the general public, then it is also equally available to the police. **California v. Rooney**, 483 U.S. 307, 324, 1107 S.Ct. 2852, 97 L.Ed.2d 258 (1987).

¶57. In the instant case, Officer McKaig was in an area of common use, near the driveway and the back door. Mitchell had been in his car in his driveway, when he got out of his vehicle and first noticed Officer McKaig. An illegal trespass by the police did not occur in this case. The evidence eventually gathered from Mitchell's person and vehicle was not tainted by the police visiting Mitchell's residence to question him. Thus, the trial court did not err in denying Mitchell's motion to suppress the evidence.

### VI. WAS EVIDENCE IMPROPERLY SECURED FROM THE DEFENDANT'S BODY AND SHOULD ALL OF THE EVIDENCE OBTAINED THROUGH THIS SEARCH WARRANT HAVE BEEN SUPPRESSED?

¶58. Mitchell asserts that Mississippi law does not provide for search warrants of the person and that the evidence collected from Mitchell should have been suppressed. The record indicates that a warrant was issued at 1:31 p.m. and executed at 3:10 p.m. on November 22, 1995, for the purpose of searching Mitchell's body. Evidence collected encompassed Mitchell's clothing, including blue jeans, and a suspect rape kit. Mitchell's motion to suppress this evidence was heard and denied June 4, 1998. Of all the evidence seized from Mitchell's person, it appears only the blue jeans with human blood on them were admitted at trial, rendering analysis of the admissibility of the rape suspect kit moot.

¶59. The Supreme Court in **South Dakota v. Opperman**, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), outlined several factors which must exist in order for an inventory search to be valid. First, the thing or person searched must be lawfully in police custody. **Opperman**, 428 U.S. at 375. Second, the inventory must be conducted pursuant to standard, routine police procedures. *Id.* at 372-74. This factor ensures that the intrusion is limited in scope to the extent necessary to carry out the care-taking function for which the search is made. *Id.* And finally, there must be no suggestion that the standard procedures are a pretext concealing an investigatory police motive. *Id.* at 376. In his concurring opinion in **Opperman**,

Justice Powell explained, "Inventory searches . . . are not conducted in order to discover evidence of a crime."*Id.* at 383.

¶60. The Supreme Court has also stated that a warrant is not required for an inventory search because its justification does not rest on probable cause. *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed. 2d 65 (1983). The case law contemplates the inventory search to be solely an administrative task. *Opperman* involved the search of a car impounded by the police department. In the cases involving inventory searches of persons, the search is conducted as part of a routine booking procedure. As the Supreme Court explained in *Lafayette*, an inventory search is "an incidental administrative step following an arrest and preceding incarceration." *Lafayette*, 462 U.S. at 644.

¶61. The search in the case at hand clearly does not meet the criteria of a valid inventory search. The fact that the return on the search warrant contains a listing titled "inventory of things taken pursuant to the warrant" does not mean a routine inventory search was conducted here. Based upon the record, it is clear that the warrant was sought and the search conducted in order to obtain items of evidentiary value. There is nothing in the record which indicates this was a standard, administrative search conducted pursuant to routine procedures. Neither is there evidence which suggests that had the search warrant not been executed, Mitchell's clothing would have been seized at the police station for purposes of inventory. At the suppression hearing, the prosecutor stated, "I agree with [defense counsel] that there is no evidence whatsoever that these articles were taken other than for any other reason other than pursuant to the search warrant."

¶62. A similar scenario existed in *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed. 2d 771 (1974). Edwards was lawfully arrested and charged with attempting to break into a post office. He was booked and placed in a cell. Shortly thereafter, investigation revealed that entry had been made through a wooden window, leaving paint chips on the window. The next morning, Edwards's clothing was taken from him and held as evidence as examination of the clothing revealed matching paint chips. It is important to note, and this Court has recognized, that Edwards's clothes were seized not as part of a routine booking procedure, but in order to obtain evidence of the crime for which he had been arrested. *See Rankin v. State*, 636 So. 2d 652, 657 n.8 (Miss. 1994). The Supreme Court explained that the search was a valid warrantless search incident to a custodial arrest. *Edwards*, 415 U.S. at 1236. The Court explained that such searches are justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime. *Id.* at 1237. The Court stated that searches and seizures that could be made on the spot at the time of arrest may be conducted later when the accused arrives at the place of detention. *Id.* (citing *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed. 2d 668 (1960)).

¶63. This Court relied upon *Edwards* in *Rankin v. State*, 636 So. 2d 652 (Miss. 1994). In *Rankin*, the defendant was arrested for carrying a concealed weapon. When he arrived at the jail, officers searched the defendant's jacket and found cocaine. The defendant was then placed under arrest for possession of cocaine. On appeal, the defendant argued that his clothing was illegally searched. This Court set forth two grounds in holding that the strictures of the Fourth Amendment were met by the search. First, the Court noted that because the personal effects of one under lawful custodial arrest were subject to search at the time and place of arrest, they were likewise subject to a warrantless search at the place of detention. *Id*. at 657. Second, the Court stated that the search was also valid as "part of a routine inventory search at the place of detention, incident to processing the arrestee." *Id.*

¶64. Based upon the first rationale expressed in *Rankin*, a valid warrantless search of Mitchell's personal effects occurred at the site of where he was being detained after a lawful custodial arrest. The trial court properly denied the suppression of such evidence. This issue is without merit.

## VII. WERE THE DEFENDANT'S SPEEDY TRIAL RIGHTS VIOLATED?

¶65. Mitchell asserts that his speedy trial rights were violated. A careful review of the record yields the following chronology of Mitchell's case:

November 22, 1995 Mitchell arrested for traffic violations, and subsequently arrested for Milliken's murder. Mitchell makes his initial appearance on the capital murder charge. Warrant is issued for Mitchell's arrest for parole violations (illegal use of drugs or alcohol).

April 16, 1996 Mitchell files demand for speedy trial through attorney Keith Roberts.

July 25, 1996 Mitchell is indicted on his first indictment

August 5, 1996 Mitchell files pro se demand for a speedy trial.

October 1, 1996 Mitchell files pro se motion to dismiss charge for lack of speedy trial.

October 10, 1996 Mitchell arraigned on first indictment. Addressing the speedy trial request, the trial judge offers to "put the jury in the box tomorrow or next week."Mitchell declines, explaining that he and the State agree on trial date for February 10, 1997.

January 21, 1997 Mitchell files for continuance for trial set for February 10, 1997.

January 31, 1997 Correction made on date originally set for trial (February 3rd instead of 10th); motion for continuance made by defense is discussed. Defense counsel mentions reasons for making continuance motion including the need for access to physical evidence related to Mitchell's vehicle and lab samples, and the need to view evidence in order to get expert testimony prepared. Prosecutor notes that defense has not requested any physical evidence go to a laboratory or expert. Trial judge continued the case until a scheduling order could be set and sets February 14, 1997 as the date of the status conference to determine the scheduling order. The trial judge remarked that the continuance would run against Mitchell for the purpose of speedy trial determinations and mentioned again that if Mitchell wanted "a speedy trial, we can put the jury in the box." The resulting scheduling order included Mitchell's waiver of all speedy trial rights.

October 21, 1997 Status conference held where the State announced it would be prepared to go forward with trial on November 3, 1997-but was undecided on the issue if the trial judge granted defense's motion to suppress the confession. Defense mentioned they were prepared either way. Roberts, Mitchell's attorney, explains that he feels the speedy trial issue is frivolous due to Mitchell having his parole revoked and that he has not continued to pursue the speedy trial issue because he and Mitchell disagree on if there is a violation.

October 28, 1997 Hearing occurs regarding defense counsel's motion to withdraw. Mitchell states that he "acted a little bit hasty" and withdraws his request to fire his attorney. Defense counsel not

prepared to argue pretrial motions due to the pre-existing conflict with Mitchell. Defense counsel moves ore tenus to expand time to file motions, and to schedule suppression hearing for November 6, 1997. Defense counsel asks for trial in January or February (trial had been scheduled for November 3, 1997). Defense counsel and Mitchell waive all speedy trial rights associated with motion for continuance and modification of scheduling order.

November 3, 1997 Mitchell's motion for a continuance granted. The trial is rescheduled for March 30, 1998.

January 17, 1998 Trial judge grants Mitchell's motion to substitute Pisarich for Roberts as attorney of record.

February 5, 1998 Mitchell, by and through his new attorney, files several motions, including a motion to re-open the court's hearings on the previous motions for a speedy trial.

February 6, 1998 Motion hearing held. Mitchell is represented by Pisarich and Musselman (as opposed to previous representation of Roberts and Musselman). Pisarich had filed several motions the day before and agreed to continue the motions. Mitchell consents to the continuance.

March 24, 1998 Mitchell, through his attorneys, files motion for continuance and waives his speedy trial rights for the time period from when the trial had been set, March 30, 1998, until the time of the new trial. The trial is set for July 20, 1998.

April 3, 1998 Motion hearing is held on the motion to suppress.

April 29, 1998 Mitchell is indicted on his second indictment to correct a scrivener's error that occurred on the original indictment.

June 3, 1998 Mitchell, through his attorneys, files another motion to re-open the court's hearing on the previous motions for a speedy trial. June 4, 1998, A hearing is held. Mitchell is arraigned on the second indictment. Mitchell pleads not guilty. Defense counsel concedes that the speedy trial issue has never been fully presented to the trial court. The trial judge, at defense counsel's request, reserved ruling on the motion for a speedy trial for the next hearing date.

June 8, 1998 Mitchell, through his attorneys, files "motion to dismiss based on violations of defendant's rights to a speedy trial" and a request for an evidentiary hearing.

July 15, 1998 Mitchell, through his attorneys, moved for a continuance based upon his demand for special venire.

July 17, 1998 A hearing is held. The trial judge comments that this is the first time that the issue of a speedy trial has been presented for consideration by stating:

But isn't it kind of ironic that the first time that it's brought up is less than 72 hours before the trial that is to be had on Monday? I can't give you any speedier trial. If you demand for a speedy trial and I want to give you a speedy trial, I can't give you one any quicker than three days; do you understand that?" Prolonged discussion of the speedy trial issue occurs, including testimony from Mitchell on the matter. The trial court overrules the motion for a speedy trial and states the following: And when they

make a demand for a speedy trial, and if it would have been brought to my attention and they asked for a speedy trial, you know, we would have given him one in three weeks after he asked for it if the parties would have been ready. But I think all of us know in a capital death case that it takes a little bit more studied effort on the part of all parties to get the matter ripe for trial. The second part is that if my family and I, and I've never done it, made a reservation to go to Disney World and for whatever reason we decided that we couldn't make it and we canceled it, it would be at least a year, I understand, before the space at Disney World would be available for our family to get there. When we have a case set for trial and we take it off the trial docket, you know, I've tried Richard Gerald Jordan, I think other capital murder trials, and because of the size of this docket it is just extremely difficult to have a judge and a contract defender or public defender and prosecutor doing nothing but waiting to go to trial on these death cases. I have reviewed in my mind all that I can recollect concerning the hearings that we have had. Of course the record would be specific on it. But under the totality of the circumstances of the evidence that's before the Court, both presented here today as well as what's been presented in the other hearings, I'm going to find that the motion is not well taken. I'll deny the motion for a speedy trial.

¶66. Mitchell asserts that he has been denied a speedy trial, under the 270-day statute and the state and federal constitutions. Miss. Code Ann. § 99-17-1 (2000), the statutory speedy trial rule, provides:

> Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.

"The right to a speedy trial is guaranteed by the sixth and fourteenth amendments to the United States Constitution and art. 3, § 26 of the Mississippi Constitution of 1890." *Watts v. State*, 733 So.2d 214, 235 (Miss. 1999).

¶67. "The constitutional right to speedy trial attaches at the time when the defendant is first effectively accused of the offense." *Gray v. State*, 728 So.2d 36, 47-48 (Miss. 1998) (citing *Perry v. State*, 419 So.2d 194, 198 (Miss. 1982)). This Court has held this to begin at the "'time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge.'" *Perry v. State*, 637 So.2d 871, 874 (Miss. 1994) (quoting *Lightsey v. State*, 493 So.2d 375, 378 (Miss.1986)).

¶68. Mitchell was arrested November 22, 1995. He was first indicted on July 25, 1996. Mitchell's arraignment on his first indictment occurred October 10, 1996. On April 29, 1998, Mitchell was indicted on his second indictment to correct a scrivener's error that occurred on the original indictment. Mitchell was arraigned on his second indictment on June 4, 1998. He was tried on July 20, 1998.

¶69. This Court has dealt with a speedy trial claim where the defendant was re-indicted for the same crime. This Court determined:

> under Miss. Code Ann. § 99-17-1, defendants are entitled to a speedy trial within 270 days of the date of arraignment. This court, however, has held that where a defendant is re-indicted for the same crime, the 270 day rule does no t begin to run until the arraignment on the re-indictment. See *Corley v. State*, 584 So.2d 769, 771-72 (Miss. 1991) (citing *Moore v. State*, 556 So.2d 1031, 1033 (Miss. 1990)); *Galloway v. State*, 574 So.2d 1,2 (Miss. 1990).

*State v. Shumpert*, 723 So.2d 1162, 1165 (Miss. 1998). "Further, the statute is not applicable to delays between the alleged act and the indictment." *Coleman v. State*, 725 So.2d 154, 156 (Miss. 1998). Approximately 46 days passed between Mitchell's arraignment on the second indictment and Mitchell's trial.

¶70. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), provides the test for determining whether there has been a constitutional violation of the right to speedy trial. The test requires consideration of the following factors: "(1) length of the delay, (2) reason for the delay, (3) defendant's assertion of his right, and (4) prejudice to the defendant." *Wall v. State*, 718 So.2d 1107, 1113 (Miss. 1998).

> No mechanical formula exists according to which these factors must be weighed and balanced. The weight given each necessarily turns on the peculiar facts and circumstances of each case, the quality of evidence available on each factor and, in the absence of evidence, identification of the party with the risk of non-persuasion. No one factor is dispositive. A sensitive weighing and balancing of all remain our touchstone.

*Jaco v. State*, 574 So.2d 625, 629 (Miss. 1990).

¶71. Analysis of the four *Barker* factors in the instant case is as follows:

**A. Length of delay**.

¶72. "This first step under *Barker* acts as a 'triggering mechanism.' *Spencer v. State*, 592 So.2d 1382, 1387 (Miss. 1991); *Smith v. State*, 550 So.2d 406, 408 (Miss. 1989). If the delay is not presumptively prejudicial there is no need for further inquiry under *Barker*." *Hurns v. State*, 616 So.2d 313, 317 (Miss. 1993). The length of delay is measured by the period of time between the defendant's accusation and trial. Accusation is defined as the initiation of prosecution by "arrest, indictment, or other official accusation". *Doggett v. United States*, 505 U.S. 647, 655, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Mitchell was arrested on November 22, 1995, and went to trial on July 20, 1998, a delay of 970 days from the time of his arrest.

**B. Reason for delay**.

¶73. This factor evaluates the prosecution's reasons for the delay. Mitchell asserts that the prosecution, "on a number of occasions" failed to provide timely discovery material to the defense. Mitchell fails to provide a specific example of when the prosecution was late in delivering discovery material. The record shows that the trial judge was prepared to empanel a jury, any time after October 10, 1996. Mitchell frequently requested or consented to a number of continuances, including as late as July 17, 1998, which was Friday before the trial began on Monday. In almost all of these continuances, Mitchell waived his speedy trial rights. The record reflects that Mitchell requested at least three continuances which were granted by the trial judge. Mitchell's need for continuances included: the need to access materials to physical evidence related to Mitchell's vehicle and lab samples in order to prepare expert testimony (Mitchell had not requested any physical evidence go to a laboratory or expert); Mitchell's counsel was unprepared to go forward with defense's motions because he (Roberts) was making a motion to withdraw as counsel when a reconciliation between Mitchell and his counsel occurred; and, because Mitchell's new counsel (Pisarich) needed additional time to prepare his motions and review discovery in the case. It is clear from the record that the State is not responsible for the delays in the instant case.

### C. Defendant's assertion of right to a speedy trial.

¶74. The third factor to be weighed is a defendant's assertion of a speedy trial right. *Barker* 407 U.S. at 531-32. The defendant does not waive his right by failing to assert. *Id*. at 528. The record shows that Mitchell filed a demand for speedy trial through attorney Keith Roberts on April 16, 1996; a pro se demand for a speedy trial on August 5, 1996; and, a pro se motion to dismiss charge for lack of speedy trial on October 1, 1996. While these motions were filed with the trial court, they were not brought before the trial court for discussion until the Friday before the trial was to begin the following Monday.

¶75. An analogous issue was considered by this Court in a case where the defendants (Steve and Jerry) did not present the speedy trial issue to the trial judge until the day before the cases were set for trial. *Jaco v. State*, 574 So.2d at 632. This Court stated:

> Of course, an accused has no duty to bring himself to trial. *Barker* at 527; *Vickery v. State*, 535 So.2d at 1377; *Williamson v. State*, 512 So.2d 868, 877 (Miss. 1987); *Reed v. State*, 506 So.2d 277, 281 (Miss. 1987); *Nations v. State*, 481 So.2d 760, 761 (Miss. 1985); *Turner v. State*, 383 So.2d 489, 491 (Miss. 1980). Still he gains far more points under this prong of the *Barker* test where he has demanded a speedy trial. On the present record, neither Steve or Jerry gets any points.

*Jaco*, 574 So.2d at 632.

¶76. Mitchell made little attempt to expedite the proceedings against him. In making his multiple motions for continuance he knowingly waived his right to a speedy trial each time. It should be further noted that the trial judge repeatedly commented that he was willing to get a jury empaneled if Mitchell chose to pursue the motions for speedy trial that had been filed. When Mitchell finally asserted his right to a speedy trial, it was not done in a timely fashion.

### D. Prejudice to the defendant.

¶77. In considering the amount of prejudice to the defendant this Court must look to three interests for which the speedy trial right was designed: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532.

¶78. Mitchell points to the fact that he was incarcerated for 970 days before going to trial as his prejudice, but he does not provide any specific example of how his defense was hampered by delay in this case. Mitchell incarceration was not only the result of being accused of murder, but was also for violations of his parole. In *Hurns v. State*, 616 So.2d 313, 318 (Miss. 1993), where the defendant was already incarcerated and failed to "even attempt to show particularized prejudice", this Court weighed the factor of prejudice to the defendant in the favor of the State.

¶79. Mitchell contends that the trial judge applied an erroneous standard. The trial judge held a lengthy hearing and based his ruling on "the totality of the circumstances," as outlined in *Watts v. State*, 733 So.2d at 235:

> No single factor is dispositive. *Skaggs*, 676 So.2d at 900. Rather, this Court looks at the totality of the circumstances in determining whether a defendant's rights have been violated. *Herring v. State*, 691 So.2d 948, 955 (Miss.1997).

In *Watts* the delay at issue was 959 days. This Court determined the following:

> Given that the delays in Watts' trial were not attributable to the State, but to the defendant's first three motions for continuances, that Watts made no effort to assert his rights prior to trial and that he has not alleged any prejudice, it cannot be said that his constitutional right to a speedy trial was violated.

*Watts*, 733 So.2d at 236.

¶80. Mitchell complains that the trial judge did not make any findings on the record as to any *Barker* factor and asserts that the trial judge should have determined whether § 99-17-1 was applicable and then made a detailed analysis of the *Barker* factors to show the amount of time that should be held against the State and Mitchell. In ruling on the speedy trial issue, the trial judge stated:

> I have reviewed in my mind all that I can recollect concerning the hearings that we have had. Of course the record would be specific on it. But under the totality of the circumstances of the evidence that's before the Court, both presented here today as well as what's been presented in the other hearings, I'm going to find that the motion is not well taken. I'll deny the motion for a speedy trial.

A trial judge's finding is entitled to the same deference as a jury verdict and will not be reversed upon appeal unless manifestly wrong. *Humphrey v. State*, 759 So.2d 368, 375 (Miss. 2000) (citing *Jenkins v. State*, 607 So.2d 1137, 1138 (Miss. 1992)). Although it may be preferred that a trial judge be more specific in his or her findings regarding the *Barker* factors, the trial judge's failure to specifically enunciate those findings does not rise to the level of "manifest wrong" that is needed to warrant a reversal.

¶81. After careful review of the facts of this case and the *Barker* factors, this Court finds that Mitchell's right to a speedy trial was not violated.

### VIII. DID THE STATE PROPERLY ESTABLISH THE VALIDITY OF THE DEFENDANT'S MURDER CONVICTION (THE PREDICATE OFFENSE) IN ORDER TO ENHANCE THE INSTANT OFFENSE TO THAT OF CAPITAL MURDER?

¶82. Mitchell asserts that his 1975 murder conviction and resulting life sentence were not properly documented, which Mitchell claims was necessary before the prosecution could use the 1975 conviction to raise the instant offense to capital murder. Mitchell contends that a written judgment should have been presented to the trial court by the prosecution to prove that Mitchell had been convicted in Cause No. 900 in 1975. Instead of presenting a written judgment, the prosecution provided the minute book showing Mitchell's previous conviction and sentence were in the form of a written order. Mitchell alleges that the minute book entry as to Cause No. 900 is faulty because there is not a judge's signature at the bottom of the order. Mitchell relies on *Temple v. State*, 671 So.2d 58, 59 (Miss. 1996), where this Court stated that "in order for a sentence to be valid, a judgment must be entered as of record."

¶83. Mitchell's assertion regarding the trial judge's signature is incorrect because the minute book was signed by the trial judge at the conclusion of the court term. This Court stated in *Jackson v. Schwartz*, 240 So. 2d 60, 62 (Miss. 1970), "that the date of rendition of the judgment of the circuit court in term time, as well as in vacation, is the date when the judgment is signed by the judge and filed with the clerk for entry on the minutes; or if the judgment is not signed by the judge, the rendition date is the date it appears on the minutes of the court." Use of the minutes book of the trial court to document Mitchell's previous conviction

and sentence was proper. Therefore, this issue is without merit.

### IX. DID THE PROSECUTION COMMIT A DISCOVERY VIOLATION AND DID THE TRIAL COURT ERR IN SUBSEQUENTLY ALLOWING THE EVIDENCE TO BE ADMITTED AND NOT GRANT A CONTINUANCE TO THE DEFENSE?

¶84. Mitchell contends that the trial judge erred during the sentencing phase when Dr. Paul McGarry's testimony was allowed to be heard. When McGarry was questioned by the prosecution concerning the sequence of injuries to Milliken's body and her pain and suffering, the defense objected, claiming there were discovery violations that should result in McGarry not being able to testify further.

¶85. Mitchell asserted at trial that McGarry was testifying to facts that were not listed specifically in his reports and that the prosecution was attempting to put McGarry "on the stand and allow him free reign as to opinions" that were not supplied to the defense absent the autopsy report. The trial judge attempted to remedy what he perceived as a potential problem by affording defense counsel the opportunity to interview Dr. McGarry. Upon completing a brief interview with McGarry, defense counsel moved for a continuance based on statements made by McGarry that there may be other experts that would have more favorable opinions for the defense. The trial judge denied Mitchell's motion for continuance.

¶86. The prosecution argues that Mitchell waived any right to complain when Mitchell failed to object to Dr. McGarry's testimony during the guilt phase of the trial and that McGarry's testimony in the guilt phase and sentencing phase were similar.

¶87. Mitchell claims that McGarry's testimony in the guilt and sentencing phases were markedly different resulting in Mitchell being "surprised" by the information that McGarry was offering.. Mitchell also believes that only during the sentencing phase did McGarry's testimony exceed the limit of the discovery materials that had been provided by the prosecution, making Mitchell's lack of objection in the guilt phase insignificant.

¶88. Discovery in criminal cases is governed by Rule 9.04 (formerly 4.06 of the Mississippi Uniform Criminal Rules of Circuit Court Practice) of the Uniform Circuit and County Rules. Rule 9.04(I) states:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and )
>
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the nondisclosed evidence or grant a mistrial.
>
> 3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

U.R.C.C.C. 9.04(I)

¶89. Dr. McGarry's testimony in the guilt phase was substantially similar to the testimony he gave in the sentencing phase. McGarry's graphic testimony in the guilt phase included comments about the horrific injuries that Milliken sustained and the order in which these injuries most likely occurred, which goes toward the pain and suffering that the prosecution was attempting to show in the sentencing phase.

¶90. In *Holland v. State*, 705 So.2d 307 (Miss. 1997), a case involving the same Dr. McGarry, this Court held that this issue was procedurally barred because the defendant had failed to raise it during the guilt phase of the trial. This Court further held that the argument was also without merit:

> Holland failed to raise this objection during the guilt phase. See *Holland v. State*, 587 So.2d 848, 865-68 (Miss.1991) (discussing Holland's trial phase objections to Dr. McGarry's testimony, speculation not being one of them). As a result, Holland's objection is barred for not having been brought contemporaneously in the trial phase. *Box v. State*, 610 So.2d 1148, 1154 (Miss.1992). Since all trial evidence can be used in the sentencing phase, where relevant, the reintroduction of this evidence now raises no error. *Hill v. State*, 432 So.2d 427, 441 (Miss.1983).

> The bar notwithstanding, alternatively considering the issue on the merits, Dr. McGarry's testimony was not rank speculation. The general standard of review for the admissibility of qualifications of an expert to testify to areas of scientific knowledge is abuse of discretion. *Hall v. State*, 611 So.2d 915, 918 (Miss.1992). The State demonstrated that Dr. McGarry's testimony fell within the bounds of forensic pathology by demonstrating that his expertise dealt with wounds, suffering, and the means of infliction of injury. Our caselaw, as well as that of other states, permits this type of testimony. *Simmons v. State*, 105 Miss. 48, 57, 61 So. 826, 828 (1913) (physician may testify as to effect of sexual intercourse upon child's female organs).

> Discussion of pain by a forensic pathologist is admissible. Our caselaw has allowed forensic evidence to prove that a victim suffered a fatal heart attack as a result of trauma and stress induced by a beating and robbery. *Whittington v. State*, 523 So.2d 966, 976 (Miss.), cert. denied, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988); *Jackson v. State*, 441 So.2d 1382, 1383 (Miss.1983).

> Thus, in Mississippi, a forensic pathologist may testify as to what produced the injuries in this case and what trauma such an injury would produce. [footnote ommitted] Given Dr. McGarry's qualifications in forensic pathology as well as that which the field of forensic pathology encompasses, we find that this assignment of error is without merit.

*Holland v. State*, 705 So.2d at 341. This Court has also determined that this type of evidence is admissible to show that the crime was "'especially heinous, atrocious or cruel.'" *Evans v. State*, 725 So.2d at 692.

¶91. Because Dr. McGarry's testimony during the sentencing phase was substantially similar to what he offered, without objection, during the guilt phase, McGarry's testimony was properly admitted. Mitchell refers to *Harrison v. State*, 635 So.2d 894 (Miss. 1994), to bolster his assertion he did not have a reasonable time period in which to interview the State's expert and that the testimony was improperly admitted. In *Harrison* the defendant was aware that the expert (the same Dr. McGarry) would testify and also had a copy of the doctor's autopsy report, yet Harrison made no effort to question the pathologist. *Id.* at 899. This Court ruled that the trial judge made no attempt to comply with the *Box* analysis and reversed Harrison's conviction and sentence. *Id.* at 894. Mitchell believes that, although he was provided an

opportunity to interview McGarry by the trial judge, that it was insufficient compared to the unlimited access the defense had in **Holland**. In **Harrison** the disputed testimony appears to have occurred during the guilt phase, not the sentencing phase. In the instant case, Mitchell did not object to the testimony being provided during the guilt phase of the trial, foreclosing his opportunity to object to like testimony during the sentencing phase, in accordance with **Holland**. The fact that the trial judge provided Mitchell an opportunity to interview the expert prior to his testimony during sentencing does not serve as proof that a discovery violation had occurred. The trial judge did not err in denying a continuance to the defense. This issue is without merit.

### X. DID THE TRIAL COURT ERR IN NOT ALLOWING DEFENSE COUNSEL TO CROSS-EXAMINE CURTIS PEARSON REGARDING PRIOR FELONY CONVICTIONS?

¶92. Mitchell argues that the trial judge erred in not allowing the defense to cross-examine Curtis Lee Pearson about his prior burglary convictions. Pearson was a passenger in Mitchell's vehicle during the high-speed chase that led to Mitchell's arrest. Pearson testified that, during the chase, Mitchell stated two or three times that, "I got that bitch." On cross-examination, the defense attempted to ask Pearson about his prior burglary convictions, but were prohibited by the trial judge in accordance with Rule 609 (a), because the burglaries did not involve a crime of dishonesty or false statement. M.R.E. 609 provides the following:

> RULE 609. IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME
>
> (a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.

M.R.E. 609(a).

¶93. Outside the presence of the jury, Pearson testified that he had pled guilty to burglary charges three to five times in the last ten years. At the time of trial, Pearson was in custody of the Department of Corrections of Mississippi for a 1997 burglary conviction. The proffer continued with Pearson testifying that when he was arrested for the 1997 conviction, he was "on dope", when he entered an abandoned building across from his home. There the police apprehended him while he was "sitting on the commode." The trial judge ruled by stating:

> If I don't made the record finding [under M.R.E. 609 (a) (1)] then it doesn't go in. I was seeking some guidance from the moving party to make that for the Court's benefit.
>
> Based on what record is in this case at this time concerning the elements and facts surrounding the burglary, and the only burglary that I have is the one that I can consider, there is no other record made concerning the previous ones but that would be the last one where he said that he was sitting on the commode in the place in the daytime. I certainly don't think that would fall within the rules to permit that to go to the jury.
>
> It's the Court's position that our Supreme Court has adopted the position that they have adopted,

which I have to follow, concerning burglary [under 609 (a) (2)] and I going to sustain the objection of the State.

Mitchell incorrectly asserts that the trial judge failed to make the required on-record determination pursuant to Rule 609 (a)(1), but it is clear from the trial judge's comments in his ruling that he would have done so if the defense had presented anything of probative value regarding the burglary conviction and its relation to the instant case.

¶94. The issue of Pearson's burglary convictions was also addressed later in the trial. The trial judge took judicial notice of Pearson's prior convictions from the previous ten years. It was later published to the jury that Pearson had four separate burglary convictions: two in 1991, one in 1992, and one in 1996.

¶95. The standard of review for evidentiary matters has been stated by this Court as follows:

> The relevancy and admissibility of evidence are left, in large part, to the discretion of the trial court. *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). However, this discretion must be exercised within the confines of the Mississippi Rules of Evidence. *Id*. Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected. *Green v. State*, 614 So.2d 926, 935 (Miss. 1992); M.R.E. 103(a).

*Johnston v. State*, 666 So.2d 499, 503 (Miss. 1995).

¶96. It has been established by this Court "that burglary is not ordinarily admissible as a crime involving dishonesty or false statement under M.R.E. 609 (a)(2)." *Johnston v. State*, 618 So.2d 90, 94 (Miss. 1993) (citing *Townsend v. State*, 605 So.2d 767, 770 (Miss. 1992)). Therefore, if there is an issue regarding the admissibility on cross-examination of Pearson's burglary convictions, it must fall under M.R.E. 609(a)(1).

¶97. "M.R.E. 611(b) allows wide-open cross-examination so long as the matter probed is relevant." *Johnston*, 618 So.2d at 93. In the instant case, Pearson's burglary convictions were not relevant to any material fact, and were properly excluded under M.R.E. 609 (a) due to their lack of probative value. The fact that Pearson's four burglary convictions were published to the jury subsequent to the trial judge's ruling in question does not support the conclusion that such information should have been found relevant in the earlier ruling. The publishing of Pearson's burglary convictions to the jury constituted an admission of irrelevant evidence, but did not constitute an abuse of discretion on the part of the trial judge, as such information had no adverse effect on any substantial right of Mitchell's. Neither was there an abuse of discretion on the part of the trial judge, or a substantial right of Mitchell's violated when the trial judge excluded cross-examination on Pearson's burglary convictions. This issue is without merit.

### XI. WAS THE DEFENDANT ENTITLED TO A JURY INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER?

¶98. Mitchell claims that the trial judge erred in denying instruction D-13, which would have instructed the jury on manslaughter. Mitchell complains that by refusing the defense jury instruction, which would have included a heat of passion defense, he was left without a theory to argue in closing arguments to the jury. Mitchell is incorrect in his assertion that the trial judge erroneously excluded the jury instruction. Such an instruction was unsupported by the evidence presented at trial. This Court has stated:

Jury instructions should be given only if they are applicable to the facts developed in the case being tried. *Lancaster v. State*, 472 So.2d 363, 365 (Miss. 1985) (citing *Pittman v. State*, 297 So.2d 888, 893 (Miss. 1974)). To grant an instruction that is not supported by the evidence would be error. *Id*.

*Walker v. State*, 740 So.2d 873, 888 (Miss. 1999).

¶99. Manslaughter is defined as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-03-5 (Supp. 1994).

¶100. This Court has addressed lesser-included offense instructions:

Lesser-included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense.... A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).

*Hobson v. State*, 730 So.2d 20, 26 (Miss. 1998) (quoting *Welch v. State*, 566 So.2d 680, 684 (Miss. 1990)).

¶101. This Court has also defined heat of passion:

In criminal law, a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror. *Tait v. State*, 669 So.2d 85, 89 (Miss.1996) (quoting *Buchanan v. State*, 567 So.2d 194, 197 (Miss.1990)).

*Underwood v. State*, 708 So.2d 18, 36 (Miss. 1998).

¶102. When there is a lack of evidence that the killer acted "out of provoked passion, anger, rage, hatred, furious resentment, or terror", then a heat-of-passion manslaughter instruction is properly denied. *Id.* at 36. No evidence presented at trial showed that Mitchell had displayed the heat-of-passion emotions. The video published during the trial showed Mitchell explaining that Milliken had slapped him, and as a "reflex", he "hit her." This is the only evidence received by the jury that might have shown that heat of passion was an element of the crime. Nothing else presented to the jury would support a manslaughter instruction. Moreover, the slap and reflexive hit administered by Mitchell occurred in a mall parking lot, not where Milliken was subsequently killed. In an act of premeditation, Mitchell took Milliken to the area under the bridge, beat and strangled her, ran over her, and eventually killed her by crushing her skull with his vehicle. As this Court stated in *Berry v. State*, 575 So.2d 1, 12 (Miss. 1990), "No reasonable hypothetical juror could find that this killing was without malice"; therefore, the defendant "was not entitled to a manslaughter instruction." Mitchell's actions were not without malice. Therefore, a manslaughter instruction was not appropriate in this case. This issue is without merit.

**XII. DID THE TRIAL COURT ERR IN GRANTING THE SENTENCING INSTRUCTION WHICH INCLUDED THE AGGRAVATING CIRCUMSTANCE "WHETHER THE CAPITAL OFFENSE WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING ARREST OR EFFECTING AN ESCAPE FROM CUSTODY?"**

¶103. Mitchell contends that the prosecution did not advance evidence to support a theory that Milliken's murder was committed for the purpose of avoiding or preventing his detection and lawful arrest. This contention is not well-founded.

¶104. This Court has stated the standard for reviewing the sufficiency of evidence to support an "avoiding lawful arrest" instruction:

> [i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killings to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

> Under this construction the Court properly submits this aggravator to the jury if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.

*Manning v. State*, 735 So.2d 323, 350 (Miss. 1999).

¶105. Mitchell points to *Taylor v. State*, 672 So.2d 1246 (Miss. 1996), as an example of a factually similar case where this Court concluded that there was not sufficient evidence to show that a defendant committed a murder in the hope of avoiding apprehension and arrest. *Taylor* dealt with the brutal killing of a victim that the defendant had taken for a drive and killed. Almost two months after the murder, the victim's mutilated body was found in the car she had been driving the day she disappeared. The victim was identified by the clothing and personal effects found at the scene. This Court correctly determined that there was a lack of evidence to show that Taylor had committed the murder in the hope of avoiding lawful arrest and that the granting of such an instruction constituted reversible error.

¶106. The instant case is factually distinguishable from *Taylor* because there is sufficient evidence in the record to show that Mitchell murdered Milliken in an attempt to cover up evidence that he had inflicted the injuries she had received by his hand, all in the hope of avoiding arrest. Prior to her skull being crushed under the weight of Mitchell's vehicle, Milliken was the recipient of a beating, strangulation and sexual assault. According to Mitchell, some of these initial injuries were caused while they were in a mall parking lot. She was then taken to a different location where she was injured further, repeatedly run over, and then finally murdered. It is reasonable to conclude that Mitchell's act of repeatedly crushing and mangling her was done in the hope of covering up the injuries he had administered earlier. Mitchell also took her under a bridge in order to run-over her.

¶107. The surveillance tape from the convenience store shows that Milliken was fully clothed when she left work that evening. When her body was discovered she was almost completely unclothed, lending further to a reasonable belief that Mitchell had discarded most of her clothing and shoes in the hope of covering his tracks. These facts clearly demonstrate that there was sufficient evidence that the murder was committed in

an effort to avoid lawful arrest. As such, this issue is without merit.

## XIII. IS THE IMPOSITION OF THE DEATH PENALTY EXCESSIVE OR DISPROPORTIONATE IN THIS CASE?

¶108. Miss. Code Ann. § 99-19-105(3) (Supp. 2000) requires that a proportionality review be conducted by this Court when affirming a death sentence in a capital case. Section 99-19-105(3) states:

(3) With regard to the sentence, the court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶109. A careful review of the record in this appeal and death penalty cases listed in the appendix leads us to conclude that Mitchell's death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor. Also, as discussed in issue XII, the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances. Further, upon comparison to other factually similar cases where the death sentence was imposed, the sentence of death is neither excessive nor disproportionate in this case.

¶110. Having given individualized attention to Mitchell and the crimes in the case sub judice, this Court concludes that there is nothing about Mitchell or his crimes that would render the sentence of death excessive or disproportionate in this case. The record reflects that Mitchell: (1) hit Milliken in a mall parking lot; (2) took her to another location where he proceeded to beat, strangle and sexually assault her; and (3) eventually murdered her by repeatedly running over her with his vehicle. Considering these facts in comparison to other cases, there is nothing that would disqualify this defendant from receiving the death penalty. *See, e.g.*, **Hughes v. State**, 735 So.2d 238 (Miss. 1999) (death sentence was proportionate where the defendant beat, raped, stabbed and strangled the victim and then set her chest on fire after she was dead and dumped her body in an abandoned house, leaving it to rot); **Gray v. State**, 728 So.2d 36 (Miss. 1998) (death sentence was proportionate where the defendant abducted the victim from her home, forced her to withdraw money from her bank account, raped her, shot her in the face with a shotgun, ran over her with her own car, and eventually murdered her); **Holland v. State**, 705 So.2d 307 (Miss.1997) (death sentence was proportionate where the defendant asphyxiated the victim by stuffing panties down her throat and tying a shirt around her neck, inflicted stab wounds to her chest, dealt a crushing blow to her head, and sexually assaulted her). Thus, this Court affirms the death sentence imposed in this case.

## CONCLUSION

¶111. Finding no reversible error, this Court affirms the judgment of the Harrison County Circuit Court.

¶112. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED.**

**BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**

<u>APPENDIX</u>

<u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999).

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in

part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).< /P>

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

**AS TO PUNISHMENT AND REMANDED**

**FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

**DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi,** 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Russell v. State**, 607 So. 2d 1107 (Miss. 1992).

**Holland v. State**, 587 So. 2d 848 (Miss. 1991).

**Willie v. State**, 585 So. 2d 660 (Miss. 1991).

**Ladner v. State**, 584 So. 2d 743 (Miss. 1991).

**Mackbee v. State**, 575 So. 2d 16 (Miss. 1990).

**Berry v. State**, 575 So. 2d 1 (Miss. 1990).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

### <u>(continued)</u>

**Turner v. State**, 573 So. 2d 657 (Miss. 1990).

**State v. Tokman**, 564 So. 2d 1339 (Miss. 1990).

**Johnson v. State**, 547 So. 2d 59 (Miss. 1989).

**Williams v. State**, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

**Lanier v. State**, 533 So. 2d 473 (Miss. 1988).

**Stringer v. State**, 500 So. 2d 928 (Miss. 1986).

**Pinkton v. State**, 481 So. 2d 306 (Miss. 1985).

**Mhoon v. State**, 464 So. 2d 77 (Miss. 1985).

**Cannaday v. State**, 455 So. 2d 713 (Miss. 1984).

**Wiley v. State**, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, **Wiley v. State**, 484 So. 2d 339 (Miss. 1986), *cert. denied* **Wiley v. Mississippi**, 479 U.S. 1036 (1988); resentencing ordered, **Wiley v. State**, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to **Wiley v. Puckett**, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, **Wiley v. State**, 95-DP-00149, February 13, 1997 (rehearing pending).

**Williams v. State**, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.